Hat, Judge,
delivered the opinion of the court:
This is a suit brought by the plaintiffs against the United States for the sum of $325,931.97.
On May 19, 1906, the plaintiffs entered into a contract in writing with E. A. Hitchcock, Secretary of the Interior, .acting in behalf of the United States, which contract was made in pursuance and by virtue of the act of Congress approved June 17, 1902, and known as the reclamation act. The plaintiffs in said contract undertook to construct and complete the work provided for in Schedules Nos. 2 and 3 of main canal, Payette Boise project, Idaho, in accordance with the terms of the advertisement, proposal, and specifications attached to the contract, and made a part of the same. For this work the plaintiffs wei'e to be paid as provided in the specifications.
It was provided that the work should be commenced within thirty days after the contract was signed by the Secretary of the Interior, and that the same should be completed by March 1, 1908. The work was not completed by the plaintiffs, and on October 27, 1908, the contract was annulled.
In a general way the contract and specifications and the maps, plans, drawings, and profiles furnished to bidders by the defendant set forth the termini, location, dimensions, and proportions of the canal to be constructed. The specifications (par. 12) provided: “Bidders must satisfy themselves as to the nature of the material and as to all local conditions affecting the work, and no information derived from the maps, plans, specifications, profiles, or drawings, or *186 from the engineer or his assistants; will in any way relieve the contractor from any risks or from fulfilling all the terms of his contract. No bid on work depending on local conditions will be considered unless the bidder, his representative, or his engineer has visited the work and made himself familiar with the conditions.” The plaintiffs complain that there was a change in the final location of the canal, and that this final location differed from that shown on the maps and profiles. It is true that the location was different, but it is shown by the evidence that the plaintiffs knew of this final location when it was made, knew that it differed from that indioated on the maps and drawings, but they made no complaints as to the location when made and none during the progress of the work.
The total amount of material to be excavated on schedules 2 and 3 was shown in the estimates furnished plaintiffs to be 583,000 cubic yards, classified as follows: Class 1, 475,000 cubic yards; class 2, 80,000 cubic yards; class 3, 22,000 cubic yards-; class 4,. 6,000 cubic yards. The total quantity of material actually required to be moved by the plaintiffs exceeded largely the total quantity of the estimates submitted to bidders, and was 773,823 cubic yards, classified as follows: Class 1, 470,401 cubic yards; class 2, 119,791 cubic yards; class 3, 23,156 cubic yards; class 4, 60,475 cubic yards. For moving and hauling this material the plaintiffs Avere paid in accordance with the terms of the contract, and under the terms of the contract can not base a claim against the defendant, by reason of the fact that the estimates of quantity of material submitted to bidders differed largely from the quantity of material which they were required to recover and handle. The contract in this connection is as follows: “ The quantities given in the proposal are for the purpose of comparing bids, and are approximate only, and no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same ” (par. 24). It may be well to state here that the Secretary of the Interior extended the time of the contractors, when they asked for it, basing his action upon the fact that the amount of material to be removed was more than had been estimated for, and that there was a change in the amount and kind of *187 work actually required of the plaintiffs and that showed in the estimates. But this did not give to the plaintiffs any right upon which to base a claim against the defendant, especially as the contract further provided: “ The right to make material changes in the quantities listed in the proposal is an essential part of the contract, and bidders must make their estimates accordingly” (par. 25).
There was a material change in the amount and kind of work required to be and actually performed by the plaintiffs from that shown on the plans, drawings, profiles, and specifications. There was a reduction of 1.23 miles in the length of the two schedules, the plans, etc., stating that the length of the two schedules was about 13 miles, but as they were, required to be constructed the length was 11.77 miles; there was also a reduction from that indicated on the maps and drawings in the average depth of the material excavated from the prism of the canal of 1.76 feet on schedule 3, and 0.53 foot on schedule 2. But the contract provided: “ The Secretary of the Interior reserves the right to make such changes in the specifications of work or material at any time as may be deemed advisable, without notice to the surety or sureties on the bond given to secure compliance with the contract, by adding thereto or deducting therefrom, at the unit prices of the contract, or at such allowances for changes of materials as shall be deemed just and reasonable by the engineer, whose decision shall be binding on both parties ” (par. 25).
The plaintiffs complain that they were greatly damaged by reason of the large increase of overhaul made necessary by the change of location, and they undertake to show what that damage was in dollars and cents. But there is no evidence as to this, which can be relied upon. At most, it could only be claimed for as extra work, and this was not done at the time, nor were the terms of the contract complied with which set out specifically what steps the contractor was to take in the event he claimed for extra work. It is true that the change of location did necessitate more overhaul than was indicated by the plans and specifications, but the paragraphs of the specifications above quoted provided for this, and the *188 plaintiffs can not now maintain a claim for doing work for which they were paid the unit prices of the contract.
The plaintiffs lay great stress upon what they allege to be erroneous classification of material made by the Government engineers. They allege that by reason of this erroneous classification they have been damaged in the sum of some $64,000. The several kinds of material required to be excavated by the plaintiffs consisted of soil, sand, gravel, limestone, indu-rated material, cemented gravel, loose lava bowlders, lava rocks cemented together, and solid lava rock. According to the specifications the material to be excavated was divided into four classes. Class 1 was to be paid for at 15 cents per cubic yard; class 2, at 50 cents per cubic yard; class 3, at 80 cents; and class 4, at $1.40 per cubic yard (par. 42). Engineer C. C. Fisher did most of the work, and his classification was objected to by the plaintiffs from the beginning of the work. The plaintiffs made protest to the chief engineer, and finally to the Secretary of the Interior. The Secretary appointed a board of engineers to prescribe rules for the classification of material. The board consisted of three engineers connected with the work. This board recommended rules for the classification of materials. These rules were approved by the Chief Engineer of the Eeclamation Service. A reclassification of the material already classified was ordered and carried out in accordance with the recommendation of the board. This work was done by Fisher, by Edward Hedden, by Gilbert, an assistant engineer, and by Bond, an engineer who had been on the work at the beginning of the contract.
During the entire progress of the work complaints were made by the plaintiffs that the classification of the Government engineer was erroneous. These complaints were investigated from time to time by Edward Hedden and F. C. Horn, who succeeded him as project engineer; by D. W. Eoss, supervising engineer in charge of the project; by W. H. Sanders, engineer sent to the work to review the classification; and by A. P. Davis, Chief Engineer of the Eeclamation Service. The plaintiffs’ claim for classification of material was rejected by the chief engineer, and the classification made by Fisher, as well as the reclassification made by him, was approved by all of the engineers. And *189 the chief engineer of the Reclamation finally rejected all claims of the plaintiffs as to classification and reclassification, including the claim made some months after the work had been completed, this last claim having been based upon a report of two engineers employed by the plaintiffs. These engineers submitted a report to the plaintiffs showing what, in their opinion, the plaintiffs were entitled to receive. The amount which they were entitled to receive, according to the opinion of these engineers, was the sum of $312,583.12. According to the estimate made by the Government engineers, the plaintiffs were entitled to receive and did receive the sum of $248.261.07. Paragraph 8 of the specifications provided: “ Upon all questions concerning the execution of the work, the classification of the material in accordance with the specifications, and the determination of costs, the decision of the chief engineer shall be binding on both parties.” This provision of the contract is identical with the provision of the contract passed upon by this court in the case of Brinck v. United States, 53 C. C. 170, 176. In that case the court reviewed the decisions of the Supreme Court of the United States and the decisions of this court and said: “Where there is a provision in a contract making the decision of an engineer officer or other officer final as to quality and quantity, distance to be ascertained, classification of material, or any other subject matter in the contract which may be matter of dispute and which may arise during the execution of the work, the decision of the engineer or other officer will be treated as final by the courts, and will not be subject to review by them in the absence of fraud or such gross error as implies bad faith, or a failure to exercise an honest judgment in the premises.” In this case a provision of the contract was that the decision of the chief engineer as to the classification of the material should be final. It is hardly credible that six Government engineers, including the Chief Engineer of the Reclamation Service, should have united »to defraud the plaintiffs, or that they all should have been guilty of bad faith, nor does the evidence tend to show that such was the case. This court, therefore, will not undertake to *190 go back of the judgment of the engineer and to revise his action by substituting its own views in place of his.
Another claim, insisted upon by the plaintiffs was that they were greatly damaged by the turning of water into the canal for irrigation purposes, and that they were erroneously charged with the expense of getting the canal ready for that purpose, the Government having added its own forces to those of the plaintiffs for that purpose. The facts were that the Government was under contract with the New York Canal Co. to secure the passage of the water for irrigation purposes during the irrigating season. The plaintiffs were not parties to this contract and were in no way bound by its terms. The work being done by the plaintiffs in the spring of 1908 was on the New York canal, and if water was to be run for irrigating purposes during the irrigating season of 1908 it was necessary that certain work should be completed before April 15,1908, the beginning of the irrigation season, and the Government notified the plaintiffs that water must be run in the Government canal during the irrigation season of 1908. But the plaintiffs were not bound by their contract to complete the work for this purpose, more especially as their time to complete the contract was extended to June 30, 1908. The Government made the contract with the New York Canal Co. and took upon itself the obligation of supplying water for irrigation purposes, and it could not transfer that obligation to the plaintiffs. It is true that specification 52 attached to and made a part of the contract provided : “ When necessary in the prosecution of the work to interrupt or obstruct the natural drainage of the surface or the flow of artificial drains or irrigation ditches, the contractor shall provide for the same during the progress of the work in such a way that no damage will result to either public or private interests. He shall be held liable for all damages that may result from failure to provide therefor during the progress of the work.” But this specification does not apply to the work of excavation necessary to complete the work, nor does it appear that any damage would have resulted to either public or private interests had the plaintiffs been allowed to complete the excavation work, which it would have taken them only a few days to finish. *191 If there is any doubt as to the construction of the specification above quoted that doubt must be resolved in favor of the plaintiffs, as both the Secretary of the Interior and the Chief Engineer of the Reclamation Service, when this case was pending before the Auditor of the Interior Department for settlement, decided that the plaintiffs were entitled to an extension of time of 120 days by reason of the action of the Government in turning the water into the canal, which, in effect, is to say that the Government acted wrongfully in so doing. By the provisions of the contract the opinion of the chief engineer, approved by the Secretary of the Interior, is to govern both parties in determining extensions of time. However, the Government insisted upon turning the water into the canal, and on April 14, 1908, placed a force on the work for the purpose of expediting it so as to open the channel by April 15. For the forces employed for this purpose the plaintiffs were charged by the defendant with the sum of $2,266.10, which sum was deducted from the plaintiffs’ compensation. This amount we think the plaintiffs are entitled to recover. The work was done by the Government in its own interests and for the purpose of carrying out a contract with which the plaintiffs had nothing to do, and they can not be required to pay for it.
The water was turned into the canal by the Government, and on April 18, 1908, the plaintiffs were compelled thereby to cease work. At the time' the water was turned into the canal the plaintiffs were entitled to an extension of time which gave them until June 80, 1908, to complete the work. By turning the water into the canal the defendant made it impossible for the plaintiffs to continue the work, and as the water remained in the canal for six months no work •during that time could be done. The defendant by its action breached the contract, and the extension of time granted the plaintiffs was of no use to them and was rendered of no use to them by the action of the defendant. We think the plaintiffs are entitled to any damages which they suffered by reason of this action of the defendant, and those damages are set out in Finding XI.
On October 5, 1908, before the water was out of the canal the plaintiffs were notified in writing by one of the Govern *192 ment engineers to put on the work a specified force within five days or steps would be taken to suspend the contract. At the time this notice was given the work was 97-J per cent completed, and by the action of the Government the plaintiffs had been prevented from doing any work on the canal since April 18, 1908, and had been unable to utilize the time to which they were admittedly entitled. At the time this, notice was served Page, the active partner, was absent, and did not receive the notice until October 10, when he immediately took steps to assemble his force to get ready his plant, and to go to work as soon as the water was turned out. of the canal, which was not done until October 18. The plaintiffs were at work on the canal when on October 29 the Acting Secretary of the Interior suspended the contract and took over the work and the plant of the plaintiffs. The. information upon which the Acting Secretary acted was given by officers in the field, was not accurate,' and did not give the facts as they actually existed. When this notice was given the canal was in no condition to permit the resumption of work; the plaintiffs w;ere really entitled to at. least the time they had lost by reason of the action of the. defendant from April 18 to June 30, 1908. For six months the defendant had prevented the plaintiffs from doing any work, and the contract was suspended upon a statement of facts which is not sustained by the record, and no effort was made by the Acting Secretary to acquaint himself with the true facts in the case. We are of opinion that the contract, was not suspended in accordance with the terms of the contract and that the plaintiffs are entitled to any damages which they sustained by reason of such suspension. We are further of opinion that in this case the plaintiffs were delayed to their injury in the performance of their- contract by a breach of the contract by the defendant, and if the suspension of the contract was caused by that breach then the damages resulting therefrom must be responded to by the defendant. One party can not prevent the other from performing and then annul the contract because he has not performed. The damages incurred by the plaintiffs by reason of the suspension of the contract are set out in Finding XII, and these sums will be allowed.
*193 Other items are claimed by plaintiffs, but they are not supported by the evidence adduced, or they are such as can not be allowed under the law of the contract.
For the foregoing reasons the court is of opinion that the •plaintiffs are entitled to recover under Findings IX, XI, and XII, the sum of $50,228.93. It is so ordered.
Campbell, Chief Justice,.concurs.