Booth, Judge,
delivered the opinion of the court:
The plaintiff company contracted in writing to furnish the labor and material necessary to complete approximately 132,900 cubic yards of levee work in the Sny Island Levee Drainage District, Illinois. The contract was dated September 17, 1914, and the work was to be completed on or before December 15, 1915. Article 4 of the contract contains a forfeiture provision. The case turns upon the enforcement of this provision. The defendant, exerting authority in virtue of this article, on January 18, 1917, forfeited the contract, took over the contract work, and in conjunction with the La Crosse Dredging Co. completed the same at an advanced cost of $8,388.58. A counterclaim is interposed for this amount less an admitted balance due the plaintiff because of retained percentages and unpaid estimates of $4,422.02, leaving an alleged sum of $3,966.56 due the Government.
*601 The record is most contradictory. The findings express our conclusions with reference thereto. The work the plaintiff obligated itself to do was levee building, a character of work which both parties to the contract recognized as fraught with inevitable delays due to freshets and overflows. The river adjacent thereto was a menace in this respect, and the contract itself prohibited work in the winter seasons. If the earth was frozen work was to be postponed until the ground thawed.
The plaintiff began work on September 8, 1914, as soon as it received notice of the awarding of the contract. Between September 8, 1914, and December 14, 1914, the plaintiff placed 56,110 cubic yards of earth in the levee. The defendant stopped the work on December 14, 1914, because of winter weather and granted the plaintiff the right to remove its working outfit from the premises. On February' 25, 1915, the plaintiff resumed operations and continued intermittently during the entire year. The rainfall was unusual during this period and admittedly precluded the performance of any substantial amount of work. As a matter of fact, the plaintiff deposited during the entire year but 11,504 cubic yards of earth in the levees. We say “ admittedly.” In this we are justified by the action of the contracting officer. No complaint was made of the slow progress of the plaintiff, and on October 14, 1915, the contracting officer extended the time for the performance of the contract for a “ reasonable period.” The record is silent as to weather conditions prior to July, 1916. Subsequent to this date conditions were generally favorable. The plaintiff did nothing toward the performance of its contract during this year until the latter part thereof. On August 4, 1916, the contracting officer notified the plaintiff to proceed with the work and asked for a response as to its future intentions with respect, to completing its contract. Considerable correspondence ensued; we need not refer to it, for on August 24, 1916, the plaintiff notified the contracting officer that arrangements had been made to go forward with the work and a force of men would reach the site of the work on the following Tuesday. The contracting officer received the *602 above letter and answered it on August 29, 1916. Obviously this is but the usual and customary method of correspondence and notification between the parties. Nevertheless, there is no proof in the record that the plaintiff ever received the letter of August 29, 1916, and the course of events following its dispatch clearly corroborates the fact that the letter was not received. What became of it is not known. Its contents were important to both parties to the contract. The vital subject matter of the correspondence related to inspectors. The defendant was obligated to supply the same and the plaintiff agreed to provide suitable lodging and subsistence for them when engaged on the work. The plaintiff could not proceed with the work in the absence of an inspector. Payment for work accomplished depended upon his approval, and his presence on the work was indispensable.
On August 30, 1916, and again on September 10, 1916, the plaintiff wrote and mailed to the contracting officer two letters asking that an inspector be sent to the site of the work; that a working force was there being delayed by the absence of such an officer. Not receiving any response to the letters, the president of the plaintiff company called in person at the office of the contracting” officer in St. Louis, Mo., and finding him not there, told his chief clerk of the pressing-need of an inspector on the work, and to send one at once. Tiie defendant fails to find these letters in its files. That they were written and mailed is proven beyond doubt. The plaintiff did have a force of men on the work in September, 1916, the equipment for going on was there, and a sufficient number of teams could have been procured to proceed. The work was forestalled by the absence of an inspector; nothing of real consequence could be done. Preliminary work was performed and the force of men remained on the job until the last of November, 1916, when they were disbanded and work ceased.
On September 23, 1916, at a time when the plaintiff was willing, ready, and anxious to proceed, the contracting officer wrote, manifestly in utter ignorance of what was going on, and in the honest but mistaken belief that the contractor was not at work, the Chief of Engineers requesting his *603 sanction, to annul the plaintiff’s contract. In this letter he asserts “ and he is not now doing any work thereunder.” In the same communication it is said: “ The contractor wrote me under date of 24th ultimo that he had arranged to ship a force ‘ nest Tuesday.’ He was then requested to advise me as to the date on which the inspector should arrive.” Again he says: “ No further advice has been received from the contractor, and as far as known he has done no work the present season.” This information transmitted to the Chief of Engineers was contrary to the facts. It was erroneous — • the transmittal of a series of untrue facts. The plaintiff had made three efforts to notify the contracting officer of its presence on the work. The surety company on its bond had told the contracting officer the plaintiff was “ working on the job.” The plaintiff was on the work, and the impediment to its progress was dué to the defendant. We need not venture a conjecture as to the underlying cause which brought about this state of affairs. It is sufficient for our purposes to know that it existed. When the Chief of Engineers received this information he gave his sanction to the annulment of the contract. He acted upon a record transmitted to him by the contracting officer, an untrue record, and thereafter the contracting officer annuled the contract. This court said in the case of Page & Brinton v. United States, 56 C. Cls. 176, 192: “The information upon which the Acting Secretary acted was given by officers in the field, was not accurate, and did not give the facts as they actually existed,” and the plaintiff was awarded a judgment.
The plaintiff had been granted an extension of time. There is nothing in the record to positively charge it with a gross dereliction in the observance of its contract, notwithstanding little work of consequence was accomplished in 1915. The defendant made no complaint about the failure to work in the early part of 1916. It was not until August 4, 1916, that the defendant advised the plaintiff of available weather and local conditions to go on with the work. There is nothing in the record to warrant a conclusion that the plaintiff desired or anticipated a breach of its contract. On the contrary, the termination of the contractual relationship is ascribable to a mistake upon the *604 part of the defendant, a mistake for which the plaintiff is not responsible and for which negligence must be attributed to the defendant. The right of forfeiture and'the consequential loss to a contractor, subject to its exercise, will not be sustained where the record clearly establishes that the superior officer empowered under the contract to sanction the same is induced to give his approval to annulment of the contract by the receipt of grossly erroneous information. The Chief of Engineers in this case had no personal knowledge of conditions. He was not on the ground and necessarily depended upon the contracting officer. It was the duty of the contracting officer to make sure he was correct before advising his superior to take such an important step. The counterclaim of the defendant will be dismissed.
The plaintiff is not entitled to profits. The proof is wholly inadequate to warrant a judgment therefor. The plaintiff is entitled to a judgment under Finding XII, retained percentages and unpaid estimates, of $4,422.02; under Finding XIII, the value of the work done by Haskins (Finding Till), $1,615.15; and $350 for lodging and subsistence of defendant’s inspectors — a total of $6,387.11. It is so ordered.
Geaham:, Judge; Hat, Judge; DowNey, Judge; and Campbell, Chief Justice, concur.